**NOT FOR PUBLICATION**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| MICHELLE SITAR, *individually and as the Executor of the Estate of William Sitar, deceased,*  Plaintiff,  v.  JOSEPH PATRICK CLANCY, M.D., *et al.*,  Defendants. | Civil Action No. 20-8476 (RK) (TJB)  **MEMORANDUM ORDER** |

**THIS MATTER** comes before the Court upon Plaintiff Michelle Sitar's Motion *in Limine* to Bar Testimony or Other Evidence Suggesting Plaintiff was Comparatively Negligent (the "Motion"). (ECF No. 74; "Open. Br.," ECF No. 74-1.) Defendant Southern Ocean County Primary Care Associates, LLC ("SOC") joined the opposition filed by a prior defendant, Joseph Patrick Clancy, M.D.[1] ("Dr. Clancy"). ("Opp. Br.," ECF No. 75; ECF No. 86), and Plaintiff replied ("Reply Br.," ECF No. 80). The Court heard oral argument on the Motion at the Final Pretrial Conference on October 9, 2025. (Hearing Transcript, dated October 9, 2025 ("Hearing Tr.").) Having considered the parties' arguments, and for the reasons set forth below, Plaintiff's Motion is **DENIED**.

I. **BACKGROUND**[2]

This is a medical malpractice action initially brought by the Executor of the Estate of William Sitar ("Mr. Sitar") against one of Mr. Sitar's primary care physicians, Dr. Clancy, who

---

[1] The Honorable Tonianne J. Bongiovanni, U.S.M.J. has advised the Court that Plaintiff and Dr. Clancy have settled and that an agreement memorializing this settlement is forthcoming. Accordingly, the Court treats SOC as the only remaining Defendant.

[2] As the parties are familiar with the facts of this case, the Court cites only the facts necessary to resolve the pending Motion. Further, the Court accepts the facts as set out in the parties' briefing as true only for purposes of deciding the Motion. To be clear, it will ultimately be a jury that serves as factfinder at trial, not the Court.

treated Mr. Sitar between April 20, 2016 and June 4, 2019, and the medical practice itself, Defendant SOC. (Open. Br. at 6–7; Opp. Br. at 1.) Mr. Sitar, a 72-year-old retired Navy Seal, passed away on November 12, 2023 from kidney failure "secondary" to recurrent bladder cancer. (Open. Br. at 2, 11.) In this lawsuit, Plaintiff sues SOC under a theory of vicarious liability for the negligence of Dr. Clancy, a practitioner at SOC, who Plaintiff argues was negligent "in failing to timely diagnos[e] and manage" Mr. Sitar's recurrent cancer, which led to an "obstruction of his ureter by the cancer" and resulted in the "permanent kidney damage" that ultimately killed Mr. Sitar. (*Id.* at 1–2; ECF No. 49 ¶¶ 26–28.)

### A. INITIAL BLADDER CANCER DIAGNOSIS

In addition to bladder cancer, Mr. Sitar's medical history is quite substantial and includes "hypertension, hyperlipidemia, coronary artery disease and myocardial infarction, chronic back pain and a past surgical history of cardiac stent placement as treatment for his myocardial infarction and tonsillectomy." (*Id.* at 2–3.) As relevant here, in July 2013 Mr. Sitar presented to his primary care physician at the time, Herbert Rudolph, M.D., with a two month history of "dysuria and gross hematuria." (*Id.* at 3.) Dr. Rudolph referred Mr. Sitar to Charles Fernicola, M.D., a urologist, who in September 2013 ultimately diagnosed Mr. Sitar with bladder cancer. (*Id.*) Mr. Sitar then saw Shawn White, M.D., another urologist, for a second opinion, and began consulting with Patrick Colaruso, M.D., a medical oncologist, and Michael Hass, M.D., a radiation oncologist. (*Id.*) Drs. Fernicola, Colaruso, and Hass all recommended that Mr. Sitar undergo a "cystectomy," an invasive surgical procedure which entails removal of the entire bladder and "fashioning a segment of the small intestine through a stoma on the abdominal wall for urinary drainage." (*Id.* at 3–5 (citing ECF No. 74-4 at 28:12–29:19).) Mr. Sitar "adamantly refused surgery" and instead opted to undergo "bladder sparing therapies" which included combination chemotherapy and radiation. (*Id.* at 3–4 (citing ECF No. 74-2 at 18).)

2

Prior to beginning chemotherapy, Dr. White advised Mr. Sitar to keep "close surveillance" over his cancer during his course of therapy. (*Id.* at 6.) While the protocol included 6 cycles of chemotherapy, Mr. Sitar completed only 4 cycles between March and June of 2014 and did not undergo radiation therapy. (*Id.*)

### B. CARE UNDER DR. CLANCY

On April 20, 2016, Mr. Sitar began seeing Dr. Clancy because his prior primary care physician, Dr. Rudolph, left SOC. (*Id.*) Mr. Sitar regularly saw Dr. Clancy for "general medical needs and for chronic back pain." (*Id.*) On July 6, 2018, Mr. Sitar presented to Dr. Clancy with a "history of hematuria for 'a few days.'" (*Id.* at 6–7 (citing ECF No. 74-3 at 94).) Dr. Clancy reviewed a urine dipstick, which yielded "blood+++, leukocytes ++ and protein +," and ordered a urine culture, which came back negative. (*Id.* at 7 (quoting ECF No. 74-3 at 97–98).) "No further referrals, testing or follow-up for this gross hematuria was ordered by Dr. Clancy" after Mr. Sitar's visit. (*Id.*)

On February 8, 2019, Mr. Sitar again presented to Dr. Clancy with symptoms of an overactive bladder and nocturia.[3] (*Id.*) Dr. Clancy's assessment was "hematuria, unspecified." (*Id.*; *see* ECF No. 74-3 at 118).) He prescribed an anticholinergic medication to Mr. Sitar for bladder symptom management but did not undertake any further evaluations. (Open. Br. at 7.) Mr. Sitar's last visit with Dr. Clancy occurred on April 5, 2019. It appears that the medical records for this last visit did not include any written memorialization or follow-up relating to Mr. Sitar's "gross hematuria, bladder symptoms or bladder cancer."[4] (*Id.*)

---

[3] A review of the medical records appears to indicate that Mr. Sitar saw Dr. Clancy approximately 6 times between July 6, 2018 and February 8, 2019. (ECF No. 74-3 at 99–115.) The records indicate that the visits related to medical conditions such as "chronic pain syndrome," depression, and heart disease. (*Id.*)

[4] During all of Mr. Sitar's visits with Dr. Clancy, Mr. Sitar's medical chart purportedly listed bladder cancer in his past medical history. (Open. Br. at 6–7.)

3

## C. RECURRENCE OF BLADDER CANCER

Mr. Sitar began seeing a new primary care physician on June 4, 2019. (*Id.*) Upon reviewing lab work which revealed that Mr. Sitar had abnormal kidney function, the physician referred Mr. Sitar to a nephrologist, who ultimately referred Mr. Sitar back to a urologist. (*Id.*) However, before Mr. Sitar could visit this urologist, he was admitted to the hospital with a host of medical issues, including chest pain, abdominal pain, hematuria, dysuria, and weight loss. (*Id.* at 7–8.) A CT scan revealed "bilateral hydronephrosis down the level of the bladder which showed a mass-like thickening," and Mr. Sitar's right kidney was atrophic. (*Id.* at 8.) Mr. Sitar had "bilateral percutaneous nephrostomy tubes" placed which improved his creatine levels. (*Id.*) At the time of his discharge, Mr. Sitar was again referred to a urologist. (*Id.*)

On July 25, 2019, a cystoscopy by a urologist revealed "an invasive, high-grade bladder cancer which had spread to the prostate." (*Id.*) Unlike with Mr. Sitar's initial bladder cancer, this time, 6 years later, Mr. Sitar agreed to proceed with a cystectomy and other related procedures. (*Id.*) Mr. Sitar could not ultimately undergo the cystectomy, however, because a cardiac stress test indicated he was "high-risk" for a perioperative cardiac event, and thus the surgery was cancelled. (*Id.*)

In the ensuing years, Mr. Sitar continued to receive medical care for both his bladder cancer and kidney issues. (*Id.* at 8–11.) With respect to his bladder cancer, Mr. Sitar responded well to immunotherapy. (*Id.* at 9.) However, over time, Mr. Sitar's renal function deteriorated and did not improve with changing his bilateral percutaneous nephrostomy tubes. (*Id.* at 10–11.) He began undergoing dialysis in August 2023, which he continued through mid-November 2023. (*Id.* at 11.) According to Plaintiff's expert, Mr. Sitar's death on November 12, 2023 was ultimately caused by an "obstruction of the right ureter" due to his right-side bladder wall thickening, and the obstruction

resulted in permanent damage to his right kidney, which killed him. (*Id.* at 11–12; *see* ECF No. 74-7 at 3.)

    D. INSTANT LAWSUIT

While Mr. Sitar initially brought this medical malpractice suit against Dr. Clancy and SOC in July 2020, after his passing Plaintiff was amended to be Michelle Sitar, the executor of Mr. Sitar's estate. (ECF Nos. 1, 49.)

Trial is set to begin in this case on December 1, 2025. (*See* Docket Entry dated October 23, 2025.) Plaintiff intends to argue that "Dr. Clancy's failure to timely follow up on [Mr. Sitar's] complaints of hematuria in the context of the patient's history of bladder cancer allowed his recurrent cancer to progress to the point where it caused permanent kidney damage," and Mr. Sitar's death. (Open. Br. at 11.) For its part, Defendant SOC argues that Mr. Sitar's initial bladder cancer was "inadequately treated" and that "four-years of undertreated muscular invasive bladder cancer will become systemic leading to death." (Opp. Br. at 2.) Thus, "as of June 2018 [Mr. Sitar's] chance of survival was bleak given his preexistent condition." (*Id.*)

In anticipation of trial, Plaintiff has filed this motion *in limine* seeking to exclude testimony by Mr. Sitar's physicians prior to Dr. Clancy (namely, Drs. Fernicola, White, Colarusso and Haas (collectively, the "Pre-Clancy Physicians")), as well as any testimony by SOC's experts that would "suggest that [Mr.] Sitar was comparatively negligent in failing to agree to defin[i]tive therapy when he was diagnosed with invasive bladder cancer in 2013 or was noncompliant with the therapy he agreed to." (Open. Br. at 1.) SOC opposes the Motion, affirming that it does not intend to argue that Mr. Sitar was comparatively negligent, and instead, the testimony by the Pre-Clancy Physicians and SOC's experts is relevant as to proximate cause.[5] (Opp. Br. at 1.)

---

[5] More specifically, SOC notes that the Pre-Clancy Physicians' testimony confirms the extent of Mr. Sitar's initial bladder cancer and how it went undertreated, as well as confirms that the Pre-Clancy Physicians all "thoroughly . . . educated [Mr. Sitar] as to the significance of his bladder cancer and the need for ongoing

5

## II. LEGAL STANDARD

A district court has "wide discretion in determining the admissibility of evidence under the Federal Rules." *United States v. Abel*, 469 U.S. 45, 54 (1984). The purpose of a motion *in limine* is to "narrow the evidentiary issues for trial and to eliminate unnecessary trial interruptions." *Bradley v. Pittsburgh Bd. of Educ.*, 913 F.2d 1064, 1069 (3d Cir. 1990). There is also a "strong and undeniable preference for admitting any evidence having some potential for assisting the trier of fact." *Kannankeril v. Terminix Int'l, Inc.*, 128 F.3d 802, 806 (3d Cir. 1997); *see United States v. Tartaglione*, 228 F. Supp. 3d 402, 406 (E.D. Pa. 2017) ("The trial court should exclude evidence on a motion in limine only when the evidence is clearly inadmissible on all potential grounds"). It is ultimately the burden of the movant to "demonstrat[e] that the evidence is inadmissible on any relevant ground . . ." *Supernus Pharms., Inc. v. Ajanta Pharma Ltd.*, No. 21-14268, 2023 WL 4866348, at *1 (D.N.J. July 31, 2023) (citation omitted).

## III. DISCUSSION

Plaintiff argues that the sole focus of this case is Dr. Clancy's failure to timely diagnose and manage Mr. Sitar's recurrent cancer—and whether SOC is vicariously liable for same—and "not Mr. Sitar's refusal to undergo definitive therapy initall[y]." (Open. Br. at 15; *see id.* at 17 ("The only issue in the case then is whether [Dr. Clancy] deviated from the accepted standard of care in failing to recognize the possibility of recurrent bladder cancer and aggravated that condition by failing to act.").) Plaintiff argues that evidence bearing on Mr. Sitar's decisions to refuse a cystectomy and to stop his chemotherapy early is "irrelevant, prejudicial, and inadmissible pursuant to *Ostrowski v. Azzara*, [545 A.2d 148 (N.J. 1988)]." (*Id.* at 1–2.) Plaintiff posits that this evidence of Mr. Sitar's "pre-recurrence decision making and conduct" improperly raises a

---

follow up and surveillance," such that any "deviation in educating the patient by Dr. Clancy was not a proximate cause of harm." (Opp. Br. at 2.)

comparative negligence argument. (*Id.* at 14, 19.) SOC disagrees with Plaintiff's premise, arguing that any such evidence would implicate proximate cause—not comparative negligence. (Opp. Br. at 1–2.)

At the outset, Plaintiff's primary argument appears to confuse and/or conflate comparative negligence and proximate cause. Although Plaintiff is correct that "[t]he pre-treatment health habits of a patient are not to be considered as evidence of fault that would have otherwise been pled in bar to a claim of injury due to the professional misconduct of a health professional," *Ostrowski v. Azzara*, 545 A.2d 148, 155 (N.J. 1988), SOC has made clear that it "*does not intend to argue that Mr. Sitar was comparatively negligent*" and that instead, the Pre-Clancy Physicians' testimony is relevant and probative as to proximate cause, (Opp. Br. at 1 (emphasis added)). Thus, the comparative fault argument is off the table.

Notwithstanding, the Court must determine whether evidence regarding Mr. Sitar's treatment of his initial bladder cancer (prior to ever seeing Dr. Clancy) is relevant and admissible as to the issue of proximate cause. In cases "in which a defendant's negligence combines with a preexistent condition to cause harm," New Jersey has adopted a modified proximate cause test— the "substantial factor" test—which requires consideration of "whether the defendant's deviation from standard medical practice increased a patient's risk of harm or diminished a patient's chance of survival and whether such increased risk was a substantial factor in producing the ultimate harm." *Verdicchio v. Ricca*, 843 A.2d 1042, 1056 (N.J. 2004) (citation omitted). At oral argument on October 9, 2025, Plaintiff argued that *Ostrowski v. Azzara* stands for the proposition that pretreatment conduct is inadmissible to demonstrate proximate cause in this context. (Hearing Tr. at 13:21–24, 22:3–13.)

The Court disagrees with Plaintiff's reading of *Ostrowski*. In that case, a plaintiff who was a heavy smoker and had been diagnosed with diabetes and peripheral vascular disease underwent

a surgical procedure to remove a toenail. *Ostrowski*, 545 A.2d at 149–150. Following the surgery, the plaintiff's toe became painful and discolored, requiring the plaintiff to undergo immediate bypass surgery to prevent the loss of the extremity. *Id.* at 150. At the subsequent medical malpractice trial, defense counsel was permitted to show that during the pre-treatment period, "the plaintiff had smoked cigarettes and had failed to maintain her weight, diet, and blood sugar at acceptable levels." *Id.* "The trial court allowed this evidence of the plaintiff's pre-treatment health habits to go to the jury on the issue of proximate cause." *Id.* The jury—having received inadequate instruction regarding how to consider concepts of causation and fault—found the plaintiff's fault to be over fifty percent, and thus, the plaintiff was disallowed any recovery. *Id.* at 151.

On appeal, the New Jersey Supreme Court held that while pre-treatment health habits cannot be considered as evidence of *fault*, "[t]his does not mean . . . that the patient's poor health is irrelevant to the analysis of a claim for reparation":

> While the doctor may well take the patient as she found her, she cannot reverse the frames to make it appear that she was presented with a robust vascular condition; likewise, the physician cannot be expected to provide a guarantee against a cardiovascular incident. All that the law expects is that she not mistreat such a patient so as to become a proximate contributing cause to the ultimate vascular injury.

*Id.* at 156. While the court acknowledged that principles including proximate cause and comparative fault are "difficult to parse," it nonetheless observed that in the case at bar:

> the jury *had* to consider plaintiff's pre-treatment health condition to resolve whether the physician's toenail removal procedure was in any way a *proximate cause* of the bypass surgery to her leg or whether it was the decreased vascular flow attributable to her diabetic condition that required bypass surgery to her leg.

*Id.* at 157 (emphasis added). However, although not at issue in this case, the court there noted that the jury *also* had to consider whether the plaintiff's *post*-treatment conduct was a cause of her injury under the doctrine of contributory/comparative negligence, and whether her *post*-treatment conduct was a cause of her damages under the doctrine of avoidable consequences. (*Id.*) The New

Jersey Supreme Court found that "the instructions to the jury . . . did not adequately separate or define the concepts that were relevant to the disposition of the plaintiff's case," and reversed judgment. *Id.* at 157–159.

At most, *Ostrowski* emphasizes that the line between proximate cause, comparative fault, and avoidable consequences is narrow and requires proper instruction to the jury in order to keep the delineation between the concepts clearly defined. *Ostrowski* surely does not stand for the proposition that pre-treatment conduct should not be considered in the proximate cause analysis. Rather, *Ostrowski* makes clear that such evidence *can*—and arguably must—be considered as part of the proximate cause analysis. *See id.* at 158 (noting pre-treatment health habits have a "limited role," with that role "being limited to causation, not fault . . ."). Other New Jersey cases have persuasively held similarly. *See, e.g.*, *Bryant v. Calantone*, 669 A.2d 286, 289 (N.J. Super. Ct. App. Div. 1996) ("[Pre-treatment health habits] are germane to the issue of proximate cause exclusively.") (citation omitted)); *Peretz v. Belnekar Licata*, No. A-4953-17T1, 2020 WL 2507642, at *18 (N.J. Super. Ct. App. Div. May 15, 2020) ("[E]vidence of the [prior] nonuse of [an] EpiPen was relevant to the issue of proximate cause. [Expert] found the nonuse, in combination with other preexisting conditions, affected [patient's] survivability. The information was required for the experts and jury to assess how much harm defendants' malpractice caused [patient] in comparison to his pre-existing conditions.").

Therefore, testimony from the Pre-Clancy Physicians and SOC's experts regarding Mr. Sitar's pre-treatment conduct is both relevant and admissible to the jury's consideration of whether Dr. Clancy's care was the proximate cause of the kidney failure that led to Mr. Sitar's death or whether it was Mr. Sitar's decision to undertreat his initial bladder cancer that led to his death.[6]

---

[6] For the avoidance of doubt, and in accordance with *Ostrowski*, SOC will not be permitted in any way to suggest Mr. Sitar was at fault for his own death due to his decision to undertreat his initial bladder cancer. SOC appears to have already accepted this. (*See* Hearing Tr. at 18:3 ("I'm not arguing what [Mr. Sitar] did

Even though this evidence is both relevant and admissible, the Court must then determine whether it is "unduly prejudicial" and "intended to divert the jury's attention away from the issue of whether [D]efendants' negligence aggravated the patient's preexisting condition and was a substantial factor in causing the ultimate injury—permanent kidney damage and death." (Open. Br. at 22.)

Under Federal Rule of Evidence 403, "[t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice." Fed. R. Evid. 403. However, "[v]irtually all evidence is prejudicial or it isn't material." *Carter v. Hewitt*, 617 F.2d 961, 972 n.14 (3d Cir. 1980) (citation omitted). Evidence is only *unfairly* prejudicial where it has "an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." *Id.* (quoting Advisory Committee's Note, Fed. R. Evid. 403).

Here, *Ostrowski* and related cases make clear that there is a potential for a jury to consider pre-treatment conduct for the *wrong* purpose, namely comparative fault, as opposed to the *right* purpose, namely proximate cause. Consequently, there clearly is some prejudice to Plaintiff in allowing in testimony regarding this conduct. Nonetheless, this potential prejudice does not substantially outweigh the probative value of the evidence as to proximate cause—an element of the claim at-issue. As SOC seeks to argue, evidence of Mr. Sitar opting to undertreat his initial bladder cancer may have made any cure or treatment by the time the cancer recurred "bleak and highly unlikely." (Opp. Br. at 2.)

Furthermore, the Court can cure any prejudice with a limiting instruction. *See United States v. Scarfo*, 41 F.4th 136, 181 (3d Cir. 2022) (stating limiting instructions "are generally sufficient to cure any risk of prejudice" (internal quotation marks omitted)); *D'Aries v. Schell*, 644 A.2d 134,

---

was wrong."); Opp. Br. at 1 ("Defendant does not intend to argue that Mr. Sitar was comparatively negligent.").)

140 (N.J. Super. Ct. App. Div. 1994) (noting limiting instruction appropriate "to make sure that the jurors properly limit their consideration of the pre-treatment . . . testimony."). While Plaintiff objects that a jury would not be able to follow such a limiting instruction (Reply Br. at 2 n.1), jurors are generally presumed to follow limiting instructions. *See Greer v. Miller*, 483 U.S. 756, 767 n.8 (1987); *Alford v. Warden N.J. State Prison*, No. 15-5640, 2019 WL 1418121, at *8 (D.N.J. Mar. 29, 2019) ("The jury was given a limiting instruction . . . and it is presumed to have followed the trial court's instructions."). The Court will await input from the parties as to the formulation of a limiting instruction addressing the proper consideration of the evidence by the jury.

      **THEREFORE**, it is on this 13th day of November, 2025, **ORDERED** that:

1. Plaintiff's Motion (ECF No. 74) is **DENIED**; and
2. The Clerk of the Court is directed to **TERMINATE** the Motion pending at ECF No. 74.

                                                                     _____
                                                                        ROBERT KIRSCH
                                                                        UNITED STATES DISTRICT JUDGE